UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| AMAR SHAKTI ENTERPRISES, LLC, a Florida corporation, ORLANDO LODGING ASSOCIATES, LLP, an Indiana limited liability company, SHAKTI INVESTMENT, INC., an Arizona corporation, RAM-LAKHAN, INC., a North Carolina corporation, NATU PATEL, an individual, SHIVA INVESTMENTS, LLC, an Arkansas limited liability company, MHB, LLC, a North Carolina limited liability company, CABOT HOSPITALITY, LLC, an Arkansas Limited liability company, BAL KISHAN, INC., a North Carolina corporation, TESHARA INVESTMENTS, LLC, an Arizona limited liability company, and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WYNDHAM WORLDWIDE, INC., a Delaware corporation, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC., a South Dakota corporation, DAYS INNS OF AMERICA, II, INC. f/k/a DAYS INNS OF AMERICA, INC., a Delaware corporation, DAYS INNS WORLDWIDE, INC., a Delaware corporation, AMERIHOST FRANCHISE SYSTEMS, INC., a Delaware corporation, RAMADA WORLDWIDE, INC. f/k/a RAMADA FRANCHISE SYSTEMS, INC., a Delaware corporation,<br><br>        Defendants. | **CASE NO: 6:10-cv-01857-GAP-KRS**<br><br><br>**CLASS ACTION**<br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, a Florida corporation, ORLANDO

LODGING ASSOCIATES, LLP, an Indiana limited liability company, SHAKTI

INVESTMENT, INC., an Arizona corporation, RAM-LAKHAN, INC., a North Carolina corporation, NATU PATEL, an individual, SHIVA INVESTMENTS, LLC, an Arkansas limited liability company, MHB, LLC, a North Carolina limited liability company, CABOT HOSPITALITY, LLC, an Arkansas limited liability company, BAL KISHAN, INC., a North Carolina corporation, and TESHARA INVESTMENTS, LLC, an Arizona limited liability company, by and through their undersigned counsel, bring this class action on their own behalf and that of all others similarly situated, (collectively hereinafter, the "Plaintiffs"), seeking damages against Defendants, WYNDHAM WORLDWIDE, INC., a Delaware corporation, ("WYNDHAM"), SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC., a South Dakota corporation, DAYS INNS OF AMERICA, II, INC. f/k/a DAYS INNS OF AMERICA, INC., a Delaware corporation, DAYS INNS WORLDWIDE, INC., a Delaware corporation, AMERIHOST FRANCHISE SYSTEMS, INC., a Delaware corporation, and RAMADA WORLDWIDE, INC. f/k/a RAMADA FRANCHISE SYSTEMS, INC., a Delaware corporation (collectively hereinafter, the "Defendants") as follows.

<b><u>PLAINTIFFS AND BASIS FOR CLASS ACTION</u></b>

1.      Plaintiffs collectively bring this action on their own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to franchise agreements entered into with hotel franchisors doing business under the WYNDHAM brands of hotels executed between November 30, 1994, and the date the original Complaint was filed, regardless of hotel brand affiliation.

2.      Plaintiff, AMAR SHAKTI ENTERPRISES, LLC, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to DAYS INNS WORLDWIDE franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

3.      Plaintiff, ORLANDO LODGING ASSOCIATES, LLP, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to SUPER 8 MOTEL franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

4.      Plaintiff, SHAKTI INVESTMENT, INC., also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to SUPER 8 MOTEL franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

5.      Plaintiff, RAM-LAKHAN, INC., also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to DAYS INNS OF AMERICA franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

6.      Plaintiff, NATU PATEL, also brings this action on her own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to BAYMONT INN (f/k/a Amerihost) franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

7.      Plaintiff, NATU PATEL, also brings this action on her own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to RAMADA LIMITED franchise agreements executed between November 30, 1994 and the date the original Complaint was

filed.

8.      Plaintiff, SHIVA INVESTMENTS, LLC, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to DAYS INNS WORLDWIDE franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

9.      Plaintiff, MHB, LLC, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to DAYS INNS OF AMERICA franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

10.     Plaintiff, CABOT HOSPITALITY, LLC, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to DAYS INNS WORLDWIDE franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

11.     Plaintiff, BAL KISHAN, INC., also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to SUPER 8 MOTEL franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

12.     Plaintiff, TESHARA INVESTMENTS, LLC, also brings this action on its own behalf and on behalf of all other franchisees (whether individuals or entities) that are or were parties to RAMADA INN franchise agreements executed between November 30, 1994 and the date the original Complaint was filed.

## JURISDICTION AND VENUE

13.     Plaintiff, AMAR SHAKTI ENTERPRISES, LLC, is a Florida corporation

operating a Days Inns Worldwide franchise located in Titusville, Florida.

14.     Plaintiff, ORLANDO LODGING ASSOCIATES, LLP, is an Indiana limited liability company formerly operating a Super 8 Motel franchise located in Orlando, Florida.

15.     Plaintiff, SHAKTI INVESTMENT, INC., is an Arizona corporation operating a Super 8 Motel franchise located in Flagstaff, Arizona, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

16.     Plaintiff, RAM-LAKHAN, INC., is a North Carolina corporation operating a Days Inns of America franchise located in Greensboro, North Carolina, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

17.     Plaintiff, NATU PATEL, is an individual residing in California operating a Ramada franchise located in Sacramento, California and is operating a Baymont franchise located in Redding, California, and agrees to submit to the jurisdiction of this Court for purposes of this litigation, and is otherwise *sui juris*.

18.     Plaintiff, SHIVA INVESTMENTS, LLC, is an Arkansas limited liability company operating a Days Inns Worldwide franchise located in Fordyce, Arkansas, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

19.     Plaintiff, MHB, LLC, is a North Carolina limited liability company operating a Days Inns of America franchise located in Asheville, North Carolina, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

20.     Plaintiff, CABOT HOSPITALITY, LLC, is an Arkansas limited liability company operating a Days Inns Worldwide franchise located in Cabot, Arkansas, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

21.     Plaintiff, BAL KISHAN, INC., is a North Carolina corporation operating a Super

8 Motel franchise located in Greensboro, North Carolina, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

22.     Plaintiff, TESHARA INVESTMENTS, LLC, is an Arizona limited liability company operating a Ramada Inn franchise located in Flagstaff, Arizona, and agrees to submit to the jurisdiction of this Court for purposes of this litigation.

23.     Each Plaintiff and class member has entered into a contract with a Wyndham Worldwide, Inc. ("Wyndham") brand franchise.

24.     A copy of the franchise agreement entered into with the Plaintiff, AMAR SHAKTI ENTERPRISES, LLC and Defendant, DAYS INNS WORLDWIDE, INC. is attached hereto as **Exhibit "A"** and its terms are incorporated herein by reference.

25.     A copy of the franchise agreement entered into with the Plaintiff, ORLANDO LODGING ASSOCIATES, LLP and Defendant, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC. is attached hereto as **Exhibit "B"** and its terms are incorporated herein by reference.

26.     A copy of the franchise agreement entered into with the Plaintiff, SHAKTI INVESTMENT, INC. and Defendant, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC. is attached hereto as **Exhibit "C"** and its terms are incorporated herein by reference.

27.     A copy of the franchise agreement entered into with the Plaintiff, RAM-LAKHAN, INC. and Defendant, DAYS INNS OF AMERICA II, INC. f/k/a DAYS INNS OF AMERICA, INC. is attached hereto as **Exhibit "G"** and its terms are incorporated herein by reference.

28.     A copy of the franchise agreement entered into with the Plaintiff, NATU PATEL and Defendant, AMERIHOST FRANCHISE SYSTEMS, INC. is attached hereto as **Exhibit "H"** and its terms are incorporated herein by reference.

29.     A copy of the franchise agreement entered into with the Plaintiff, NATU PATEL and Defendant, RAMADA WORLDWIDE, INC. f/k/a RAMADA FRANCHISE SYSTEMS, INC. is attached hereto as **Exhibit "I"** and its terms are incorporated herein by reference.

30.     A copy of the franchise agreement entered into with the Plaintiff, SHIVA INVESTMENTS, LLC and Defendant, DAYS INNS WORLDWIDE, INC. is attached hereto as **Exhibit "J"** and its terms are incorporated herein by reference.

31.     A copy of the franchise agreement entered into with the Plaintiff, MHB, LLC and Defendant, DAYS INNS OF AMERICA II, INC. f/k/a DAYS INNS OF AMERICA, INC. is attached hereto as **Exhibit "K"** and its terms are incorporated herein by reference.

32.     A copy of the franchise agreement entered into with the Plaintiff, CABOT HOSPITALITY, LLC and Defendant, DAYS INNS WORLDWIDE, INC. is attached hereto as **Exhibit "L"** and its terms are incorporated herein by reference.

33.     A copy of the franchise agreement entered into with the Plaintiff, BAL KISHAN, INC. and Defendant, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC. is attached hereto as **Exhibit "M"** and its terms are incorporated herein by reference.

34.     A copy of the franchise agreement entered into with the Plaintiff, TESHARA INVESTMENTS, LLC and Defendant, RAMADA WORLDWIDE, INC. is attached hereto as **Exhibit "N"** and its terms are incorporated herein by reference.

35.     Additional franchise agreements relating to other WYNDHAM brands are in the custody and control of the Defendant, WYNDHAM, and one or more of the other Defendants and will be obtained by the Plaintiffs through discovery.  The franchise agreements executed by and between the Plaintiffs, including their representative class members, and the Defendants have a fixed and set term of fifteen (15) to twenty (20) years.

36.     Each of the Defendants transacts business throughout the State of Florida, specifically within the Middle District of Florida, through their franchised and other hotel and business operations.

## AMOUNT IN CONTROVERSY

37.     This is a class action where the amount in controversy exceeds, exclusive of interest and costs, the sum of $5,000,000.00.

38.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d).

## VENUE

39.     There are numerous representative franchisees of the identified class in the Middle District of Florida.   Orlando and Tampa, Florida are well known worldwide travel destinations, offering thousands of available hotel rooms both city-wide and in locations proximate to theme parks.   In particular, the metropolitan area of Orlando, Florida, is consistently ranked in industry-wide surveys near the very top of the list, with respect to the number of hotel rooms available in its respective market.   Furthermore, in a 2010 study released by the American Society of Travel Agents (ASTA), Orlando ranked number one as the top destination for the 2010 summer season, and has consistently ranked number one since 2001.

40.     Plaintiffs and a significant number of other class members who they are representing, own and operate hotels located in the Middle District of Florida, where they each entered into a franchise agreement with the named Defendants.

41.     Venue is appropriate in the Middle District of Florida.

## NATURE OF THE ACTION

42.     Plaintiffs' action against the Defendants arises from the Defendants' violation of certain express and implicit terms of various franchise agreements that were executed between the

Defendants and each of the named Plaintiffs between November 30, 1994 and the date the original Complaint was filed, including but not limited to the monetary terms of said agreements and the operation of a guest loyalty rewards program.

43.     Plaintiffs' action against the Defendants also arises from violations of law based on unfair and deceptive conduct engaged in by the Defendants thereby breaching the covenant of good faith and fair dealing that exists for all contracts under Florida and New Jersey law and other laws prohibiting such conduct.

## **PARTIES**

### I.     **The Plaintiffs**

44.     Plaintiffs and their representative class members are franchisees who own and operate, or previously owned and operated WYNDHAM franchised hotels, many of which are located in the Middle District of Florida.

45.     Plaintiffs seek to represent WYNDHAM franchisees in the United States that are or were parties to certain franchise agreements (*See* generally **Exhibits "A" – "C"** and **"G" -- "N"**) executed by franchisees in the period from approximately November 30, 1994 to the date of the filing of the original Complaint on a claim that the Defendants have injured Plaintiffs by grossly overcharging Plaintiffs for a guest loyalty reward program, by imposing upon Plaintiffs charges for said program to which the Plaintiffs never agreed, and by carrying on said program in an unfair and deceptive manner, including use of the so-called "Pro-Active Matching" program, the inflation of the loyalty programs membership rolls with thousands, possibly millions, of "members" who did not know or agree to be part of the program, and the covert effectuation of said program as a profit machine, all in violation of these agreements and other laws and all resulting  in damages to Plaintiffs and members of their class.

## II.      The Defendants

46.      Defendants, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC., DAYS INNS OF AMERICA, II, INC. f/k/a DAYS INNS OF AMERICA, INC., DAYS INNS WORLDWIDE, INC., AMERIHOST FRANCHISE SYSTEMS, INC., and RAMADA WORLDWIDE, INC. f/k/a RAMADA FRANCHISE SYSTEMS, INC. and each of them act as the franchisor with respect to numerous operating hotel properties throughout the United States.

47.      Defendant, WYNDHAM, is a Delaware corporation and is engaged in business in Orlando, Orange County, Florida through its hotel and motel franchises and other activities.

48.      Defendant, WYNDHAM, is one of the largest hotel franchisors in the world with over 7,090 hotels open, operating, and under development.

49.      Defendant, WYNDHAM, controls numerous branded hotel properties throughout the United States which operate pursuant to franchise agreements drafted by the Defendants and approved by the Defendant, WYNDHAM.

50.      WYNDHAM's franchising brands or subsidiaries include:

     a.   Wyndham Hotels and Resorts;

     b.   Wyndham Grand;

     c.   Wyndham Garden;

     d.   Wingate;

     e.   Hawthorn;

     f.   Ramada Worldwide, Inc.;

     g.   Super 8 Worldwide, Inc.;

     h.   Days Inns of America, II, Inc.;

     i.   Days Inns of America, Inc.;

    j.  Days Inns Worldwide, Inc.;

    k.  Baymont Inns & Suites;

    l.  Microtel Inns & Suites;

    m.  Howard Johnson;

    n.  Travelodge;

    o.  Knights Inn;

    p.  Tryp Hotels;

    q.  Dream;

    r.  Night;

    s.  Planet Hollywood;

    t.  Amerihost Franchise Systems, Inc.

51.    The Defendant, SUPER 8 WORLDWIDE, INC. f/k/a SUPER 8 MOTELS, INC. is a South Dakota corporation that is engaged in business in Orlando, Florida, Orange County, through their hotel and motel franchises and other activities.

52.    The Defendant, DAYS INNS OF AMERICA, II, INC. f/k/a DAYS INNS OF AMERICA, INC. is a Delaware corporation that is engaged in business in Orlando, Florida, Orange County, through their hotel and motel franchises and other activities.

53.    The Defendant, DAYS INNS WORLDWIDE, INC. is a Delaware corporation that is engaged in business in Orlando, Florida, Orange County, through their hotel and motel franchises and other activities.

54.    The Defendant, AMERIHOST FRANCHISE SYSTEMS, INC. is a Delaware corporation that is engaged in business in Orlando, Florida, Orange County, through their hotel and motel franchises and other activities.

55.     The Defendant, RAMADA WORLDWIDE, INC. f/k/a RAMADA FRANCHISE SYSTEMS, INC. is a Delaware corporation that is engaged in business in Orlando, Florida, Orange County, through their hotel and motel franchises and other activities.

## CLASS ACTION ALLEGATIONS

### A.     Class Definition

56.     The Plaintiffs bring this class action on behalf of themselves, and all other franchisees similarly situated, pursuant to Rule 23, *Fed R. Civ. P.*

57.     The class upon whose behalf the Plaintiffs bring suit is defined as follows:

All WYNDHAM franchisees who are or were parties to a franchise agreement with the Defendants (encompassing any and all of WYNDHAM's brands as set forth in paragraph 33 herein), exemplar copies of which are attached as **Exhibits "A" – "C"** and **"G" -- "N"** to this Amended Complaint, offered to franchisees from approximately November 30, 1994 to the date of the filing of the original Complaint.  The class Plaintiffs may be or may have been parties to other franchise agreements entered into and executed with the Defendants or other WYNDHAM franchisors, which agreements are not in the present possession of the Plaintiffs, but will be obtained through discovery.

58.     This action involves various sub-classes, identified to date as follows:

A.     All hotel franchisees that are or were parties to certain franchise agreements with the Defendants from approximately November 30, 1994 to the date of the filing of the original Complaint wherein said agreement requires payment of monthly royalty fees <u>and</u> a marketing contribution or systems fee but makes no reference to qualifying stays by loyalty rewards members and does not mention Pro-Active matching or automatic enrollment.  Franchisees who fall within this subclass include those franchisees who executed franchise agreements substantially similar to those agreements attached hereto as **Exhibit "C"** (hereinafter "Subclass I").

B.     All hotel franchisees that are or were parties to a certain franchise agreement with the Defendants from approximately November 30, 1994 to the date of the filing of the original Complaint, wherein the franchise agreement requires payment of a monthly royalty fee <u>and</u> a basic reservation charge and reserves the right to increase or modify the basic reservation charge and to add fees and

charges for new services but does not otherwise delineate what the services may be.  Franchisees who fall within this subclass include those franchisees who executed franchise agreements substantially similar to the agreement attached hereto as **Exhibit "G" and "K"** (hereinafter "Subclass II).

C.      All hotel franchisees that are or were parties to certain franchise agreements with the Defendants from approximately January 1, 2004 to the date of the filing of the original Complaint, wherein the franchise agreement requires payment of a monthly royalty fee <u>and</u> a monthly contribution or systems fee <u>and</u> that authorizes the charging of a monthly fee for qualifying stays by loyalty reward members but makes no mention of Pro-Active matching or automatic enrollment.  Franchisees who fall within this subclass include those franchisees who executed franchise agreements substantially similar to those agreements attached hereto as **Exhibit "B," "H," Exhibit "I,"** and **Exhibit "J"** (hereinafter "Subclass III").

D.      All hotel franchisees that are or were parties to certain franchise agreements offered to franchisees from approximately January 1, 2004 to the date of the filing of the original Complaint, wherein said agreement requires payment of a royalty fee <u>and</u> a marketing contribution or systems fee <u>and</u> also require payment of a loyalty program charge for each loyalty reward member who has stayed in the hotel and whose stay constitutes a "qualifying stay" <u>and</u> wherein the franchisor stipulates it will Pro-actively match and award members points and charge franchisees on their qualifying stays even if the customers do not present their membership rewards card upon check-in but makes no mention of automatic enrollment.  Franchisees who fall within this subclass include those franchisees who executed franchise agreements substantially similar to those agreements attached hereto as **Exhibit "A," Exhibit "L," Exhibit "M," and Exhibit "N"** (hereinafter "Subclass IV").

59.     The franchise agreements have similar provisions that, in each instance as to each subclass, have been breached by the Defendants, and the Defendants have engaged in wrongful conduct against each of their franchisees irrespective of the hotel brand and without limitation as to each subclass.

**B.**     **Prerequisites under Rule 23(a), Fed. R. Civ. P. and Compliance with Rule 23(b)**

60.     The identified class, including sub-classes, is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact number of class members nor the exact make-up of the sub-classes because such information is in the exclusive control of the Defendants.  However, due to the nature of the business involved and the duration of the franchise agreements in question, Plaintiffs believe that there are several thousand class and subclass members and that the class and subclasses are sufficiently numerous and geographically dispersed throughout the United States that joinder of all members is impracticable, other than through the use of the class action mechanism. Wyndham has over 5,900 hotels in the United States with over 840 more "in the pipeline" to begin operating and, world-wide, Wyndham has over 75,000 hotels.[1]

61.     The following questions of law or fact, at a minimum, are common to the class and the sub-classes:

> (a) Whether the Defendants, individually or acting in concert with each other, breached the subject franchise agreements by requiring the Plaintiffs and all other similarly situated franchisees to pay an additional monthly franchise fee of up to five percent (5%) of gross room sales for all room sales to all customers who may be reward members; and
>
> (b) Whether the Defendants, individually or acting in concert with each other, and each of them engaged in unfair and deceptive trade practices by requiring the Plaintiffs and all other similarly situated franchisees to pay an additional monthly franchise fee of up to five percent (5%) of gross room sales for all room sales to all customers who may be reward members and whose identity was only ascertained through the mechanism of Pro-Active Matching; and
>
> (c) Whether the Defendants, individually or acting in concert with each other, and each of them breached the covenant of good faith and fair

---

[1] Wyndham Worldwide General Overview Presentation (July 29, 2011); 2010 Annual Report Form 10-K (Feb. 21, 2011).

dealing that is a part of every contract by engaging in unfair and deceptive trade practices by requiring the Plaintiffs and all other similarly situated franchisees to pay an additional monthly franchise fee of up to five percent (5%) of gross room sales for all room sales to all customers who may be reward members and whose identity was only ascertained through the mechanism of Pro-Active Matching; and

(d) Whether the Defendants, individually or acting in concert with each other, breached the express and implied terms of the subject franchise agreements by imposing and using the monthly franchise fee of up to five percent (5%) of gross room sales for all room sales to all customers who may be reward members as a profit making vehicle as opposed to the operation, marketing, and maintenance of the program as required by the agreements; and

(e) Whether the Defendants, individually or acting in concert with each other, engaged in unfair and deceptive practices, breached the express terms of the franchise agreements, and the implied covenant of good faith and fair dealing by implementing the program in a commercially unreasonable manner and inflating the rolls of the guest rewards program with so-called "members" who never knew or agreed to be part of the loyalty program, but instead were automatically enrolled in the program by virtue of using Wyndham's website, thereby grossly overcharging Plaintiffs; and

(f) Whether the Defendants, individually or acting in concert with each other, engaged in unfair and deceptive practices, breached the express terms of the franchise agreements, and the implied covenant of good faith and fair dealing by engaging in an actual and de facto policy of obfuscation and denial with respect to the operation of the guest loyalty program, *i.e.*, refusing to disclose the details or operation of the loyalty program, refusing to identify the use to which the so-called fees were being put, rebuffing and ignoring requests for information made by or on behalf of the Plaintiffs and those similarly situated, and retaliating against certain Plaintiffs for seeking such information and exercising their rights in pursuit of this suit.

62.     The questions set forth above and other questions of law or fact are common to the class and predominate over any question affecting only individual class members.

63.     The issues of whether the Defendants have breached the express or implied terms of the franchise agreement(s) between the parties or have otherwise violated the law or both by: a) assessing

unwarranted and exorbitant monthly franchise fees of up to five percent (5%) of gross room sales; b) extracting said fees and imposing said program without the Plaintiffs' consent or mutual understanding to either; c) by implementing the program in a commercially unreasonable manner including: i) inflating the rolls of the guest loyalty programs with "members" who never knew or agreed to be part of the loyalty program or were automatically enrolled by virtue of their failure to uncheck a box on Wyndham's website, *i.e.*, to "opt out" of membership at the time the individual reserved a stay, ii) using Pro-Active Matching, which Plaintiffs also never agreed to or understood and which also breaches the contracts; and d) acting in bad faith by engaging in an actual and de facto policy of obfuscation and denial with respect to the operation of the guest loyalty program and the use to which its so-called fees are being put and retaliating against certain Plaintiffs, predominates over any other questions of law or fact to be resolved in this matter.

64. Plaintiffs' claims are typical of the claims of each member of the identified class or subclass. The Plaintiffs and all members of each subclass are or were parties to an identical or virtually identical franchise agreement, are similarly adversely affected by the wrongful and illegal implementation of the guest loyalty program, including the imposition of an exorbitant additional monthly fee of up to five percent (5%) of gross room sales for certain stays, are similarly adversely affected by unfair, deceptive, bad faith practices such as Defendants' use of Pro-Active Matching and the artificial inflation of the rolls of the guest rewards program, and are similarly adversely affected by Defendants' actual and de facto policy of obfuscating and denying information about said program and the fees of said program.

65. The Plaintiffs will fairly and adequately represent the interests of their respective subclasses in that each is a typical franchisee owner who is, or was, a party to a certain franchise agreement with no inherent conflicts affecting any other member of the class or subclass.

66.     Furthermore, the Plaintiffs have retained competent counsel experienced and conversant with contract law, class actions, consumer protection, internet commerce, commercial litigation and federal law.

67.     Class action treatment is superior to requiring each individual to bring an independent action for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured franchisees to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of effort. Class treatment also permits the adjudication of claims by class members who are small hotel operators located throughout the nation who could not otherwise afford to individually litigate claims against a large corporate defendant.

68.     It is desirable to concentrate the litigation of these claims in this forum to avoid the time and expense of individualized litigation.  The cost of individualized litigation, both to the parties and the courts, would be substantial.   Individualized litigation also presents the potential for inconsistent or contradictory judgments and would magnify the expense and delay to all parties and the court system in multiple rounds of discovery, multiple scheduling orders and multiple trials of the issues in this case.   By contrast, the conduct of this action as a class action presents no management difficulties, efficiently conserves the resources of the parties and the court system, protects the rights of each class member, and eliminates the potential for inconsistent or disparate judgments.

## STATEMENT OF FACTS

### Wyndham's Revenue Streams and The Franchise Agreements

69.     According to Wyndham's 2010 Annual Report, Wyndham is the world's largest hotel franchisor.[2]  Wyndham "does not own any hotels" but has contracted with and derives

---

[2] *See* 2010 Annual Report Form 10-K at p. 5.

revenue streams from more than 5,900 hotels in the United States alone.[3]   According to Wyndham, since it owns no hotels, it has "low operating cost structures" and "recurring fee streams [which] yield high margins."  Its "[c]apital requirements are relatively low."[4]

70.     Wyndham Worldwide estimates it net revenue for 2011 at between $710 - 730 million dollars.  According to Wyndham, over 88% of its Hotel Group's revenues are derived from "franchising activities." [5]

71.     According to Wyndham's 2010 Annual Report, "franchise fees generally are based on percentages of the franchised hotel's gross room revenues," and Wyndham derives revenue from "ongoing franchise fees" in three ways:  royalty, marketing, and reservation fees. Wyndham defines each of these in its Annual Report stating:

> Royalty fees are intended to cover the use of our trademarks and our operating expenses, such as expenses incurred for franchise services, including quality assurance and administrative support, and to provide us with operating profits.
>
> Marketing and reservation fees are intended to reimburse us for expenses associated with operating an international, centralized, brand-specific reservations system, access to third-party distribution channels, such as online travel agents ("OTAs"), advertising and marketing programs, global sales efforts, operations support, training and other related services.

Annual Report Form 10-K at 8 (February 21, 2011).

72.     Notwithstanding these three types of franchise fees, the same Annual Report goes on to note that

> We also earn revenues from the Wyndham Rewards loyalty program when a member stays at a participating hotel. These revenues are derived from a fee we charge based upon a percentage of room revenues generated from such stay. These loyalty fees are intended to reimburse us for expenses associated with administering and marketing the program.

---

[3] *See* Wyndham Worldwide General Overview at 5-6 (July 29, 2011).
[4] *Id.* at 5.
[5] *See* 2010 Annual Report Form 10-K at p. 5.  But see Wyndham Worldwide Overview Presentation to Investors at 6 (July 29,2011)(attributing 75% of revenues to Royalty, Marketing & Franchise Fees and Wyndham Rewards fees).

73.     According to the Annual Report, this uncategorized, additional form of revenue known as Wyndham Rewards is one of the largest loyalty programs in the hospitality industry worldwide.[6]

74.     Wyndham has consistently refused to disclose to franchisees exactly how much revenue the Wyndham Rewards program generates or how the money is being spent, notwithstanding the fact that Wyndham's own Annual Report (in addition to the express and implied terms of the subject franchise agreements) requires these fees to be used to "reimburse" Wyndham "for expenses associated with administering and marketing the program."

75.     Wyndham has disclosed that for the past three years, Wyndham's loyalty rewards programs, including Wyndham Rewards, has carried over balances of $29 million, $23 million, and $13 million respectively for 2008, 2009, and 2010.

76.     Wyndham has consistently refused to disclose or otherwise itemize its expenditures for the Wyndham Rewards program or why regularly carrying over such substantial balances is permissible when the fees are, according to Wyndham (and the franchise agreements) for reimbursement of operational and marketing expenses.

77.     Upon information and belief, the actual disparity between the amount Wyndham collects in Wyndham Rewards fees and Wyndham's operational and marketing expenses for the program is substantially larger and more disproportionate.

78.     This information is proprietary to Wyndham and can only be obtained through discovery.

79.     Wyndham's tremendous revenue streams are borne out by the division of revenue Wyndham recovers from the Plaintiffs:  Plaintiffs and similarly situated class members pay

---

[6] Id. at 5.

between 4 – 6.5% of their gross room revenue in franchise fees, while Plaintiffs pay in addition, up to 5% of their gross room revenue for Wyndham Rewards.

80.     As of December 31, 2010, Wyndham claimed to have some 23.4 million "members" enrolled in the rewards program.  As discussed below, Wyndham charges the Plaintiffs and class members up to 5% of each night's gross room charge every day that one of these so-called "members" stays at a branded property.  However, according to Wyndham's own 10-K, almost 2/3 of these so-called members are individuals who are 'inactive' *i.e.*, individuals who have not "earned or redeemed" points in the last 18 months.

81.     Upon information and belief, the overwhelming majority of these 18 million inactive "members" are individuals who did not make a knowing and voluntary decision to enroll in the program, but rather were instead automatically enrolled when they failed to "opt out" of the membership program by unchecking a box on Wyndham's website.  These "inactive 'members'" points expire and Wyndham pockets the money it charged the hotel owners.

82.     Neither the amount Wyndham charges franchisees for so-called rewards "members", nor the manner in which Wyndham automatically made millions of customers into members, nor Wyndham's process identifying and billing franchisees for these phantom "members", *i.e.*, Pro-Active Matching, is permissible under the franchise agreements.

**The Scheme to Unfairly Inflate Marketing Fees**

83.     Sometime in the 1990s or in the 2000s, the Defendants established their loyalty rewards program, a multi-brand program for customers of all of WYNDHAM's numerous hotel and motel franchises.  This program has been referred to, at various times, as Trip Rewards or by some other name and is now known as Wyndham Rewards.

84.     Wyndham Rewards is a rewards program for hotel customers as part of Wyndham's marketing of all of its brands.  Wyndham Rewards apply for any hotel in the Wyndham brand product line.

85.     Prior to the creation of Wyndham Rewards, it was (and still is) customary in the industry (and in other loyalty rewards programs) for consumers or guests to become "members" of a loyalty program by taking affirmative action reflecting their knowledge and intent to become part of the program.  For example, customers or guests of other similar programs would become members by completing an application and enrolling.

86.     Defendants operate Wyndham Rewards differently however by automatically enrolling every customer who made a reservation on-line for a stay at a Wyndham hotel, unless the customer unchecked a box, thus opting out of the program.  The obvious and direct consequence has been the enrollment of what Plaintiffs to believe to be multiples of millions of consumers who were not aware of their membership in the program.

87.     The purpose of a loyalty program aimed at creating an incentive for individuals to be repeat customers to obtain perks from the program is severely undermined if the individual is unaware that he is a member or did not knowingly become a member.

88.     Regardless of whether the individuals had any idea that they were members of Wyndham Rewards, Wyndham charged Plaintiffs and class members up to 5% of their gross room revenue for each night the individual stayed at the hotel.

89.     Wyndham's gross, unauthorized, and exorbitant inflation of fees depends upon and is facilitated by a program known as Pro-Active Matching.

90.     Prior to the creation of Wyndham Rewards, it was (and still is) customary in the industry (and in other loyalty rewards programs) for individuals who are in fact "members" to

present a membership card, or take some other affirmative action in order to receive their rewards "points" for their stay or other transaction.

91.    Under the policy of Pro-Active Matching, Wyndham awards individuals points and thus charges Plaintiffs and class members fees even where the individual takes no affirmative action such as showing a membership card or requesting an award of fees or indeed, even being a knowing and voluntary "member" of the program.

92.    Pro-Active Matching awards points to "members" by matching hotel customers' identifying information through corporate reservation software designed to key off of portions of a customer's personal information.  For example, when a customer stays at a Wyndham hotel and does not present a membership card, the reservation software automatically looks for a member with the same last name and zip code or last name and address or other similar combination.  If a "match" can be found (e.g., Smith from zip 32703), the membership number is filled in automatically and points are awarded to the member in the reservation system whether the customer "matches" any other personal information or not.

93.    As a result of "Pro-Active Matching," points are awarded to customers who do not seek nor want loyalty reward points.  Often they are unaware they have even earned such points, yet the fees paid by franchisees for these customers must be paid to Wyndham or the franchise will be forfeited.

94.    Pro-Active Matching does not accomplish the stated goals of the program.  Because many hotel and motel customers have no interest in receiving points and fail to identify themselves as Wyndham Rewards members either at the time of making the reservation or when checking into the hotel or motel, no increase in brand loyalty is created by a customer that is Pro-Actively matched.

95. Informal surveys conducted by and on behalf of Plaintiffs and class members have routinely shown that large numbers of guests Pro-Actively matched had no idea that they were "members" of the Wyndham Rewards program.

96. As a result of customers becoming unknowing members of Wyndham Rewards, the membership base of Defendants' loyalty rewards program and the charges to Plaintiffs have been grossly inflated.

97. The egregiousness and "bad faith" of the entire scheme is further demonstrated by the fact that points awarded as part of the Wyndham Rewards loyalty rewards program expire automatically if they are not used within a specified period of time (e.g., 18 months). However, Wyndham does not, has never, and refuses to return the fees it charged the Plaintiffs or similarly situated class members for those individuals' stays.

98. The "bad faith" of the entire scheme is further demonstrated by the lack of disclosure and candor about the operation of the program. Indeed, there is nothing in hotel records that identifies for owners which guests or how many were Pro-Actively matched. The information can only be discerned with labor intensive guess work and for this reason thousands of franchisees are still unaware the practice even exists. Yet Wyndham is insistent that all franchisees adopt expensive and new software reservation system that is near patently defective at everything except pro-actively matching guests better and faster than earlier systems.

99. Indeed, despite repeated requests for information about Pro-Active Matching, and about the administration, accounting, expenditures, and operations of the program, Wyndham has consistently engaged in a policy of rebuffing requests made by and on behalf of the Plaintiffs and similarly situated class members, refusing to disclose the information, and even ignoring their inquiries.

100.    By refusing, rebuffing, and ignoring these requests, the Defendants have breached their franchise agreements with Plaintiffs and members of the class and committed other unfair and deceptive acts.

101.    Wyndham has engaged in this policy notwithstanding provisions requiring the various fees Wyndham collects be used only for reasonable operating and marketing expenses and services.

102.    Moreover, Wyndham has further demonstrated its "bad faith" by engaging in a policy of retaliation and covert coercion against certain hotel owners and Plaintiffs involved with this lawsuit. Wyndham has threatened the Franchise Advisory Board, that is the board of hotel owners created by court order to lobby for and represent the interests of the hotel owners to Wyndham, that it will 'freeze out' i.e., refuse to cooperate and refuse to provide it with information unless the FAB terminates the owners associated with this law suit.  Wyndham is communicating a clear message to its franchisees to 'Stop asking questions about Wyndham Rewards' and that 'If you challenge Wyndham, you will be punished.'

103.    Wyndham automatically converted all active Wyndham brand members from any previous loyalty programs into the Wyndham Rewards program.  Wyndham did not alert a single Plaintiff or class member prior to, or at the time of contracting, that Wyndham intended to or had already redefined how consumers became "members" of their loyalty program to automatically enroll individuals based upon their failure to "opt out" of the membership program by unchecking a box on Wyndham's website.

104.    None of the Plaintiffs or class members were aware that Wyndham either intended to or had already redefined the method by which a guest became a loyalty program "member" to exponentially inflate the rolls of the loyalty rewards program, thereby exponentially inflating charges against the Plaintiffs and class members.

105.    After mass outcry from Plaintiffs and those acting on their behalf, in 2009, Wyndham discontinued the use of the opt-out function but did not seek to purge its rolls of the phantom members or return funds to the Plaintiffs.

106.    Indeed, speaking in reference to its elimination of automatic enrollment, Eric Danziger, CEO of Wyndham, stated to a group of Wyndham franchisees and their representatives, "You all just cost me $15 million dollars," but eliminating automatic enrollment "was the right thing to do."

107.    Discovery will prove that there were no negotiations between the Plaintiffs and similarly situated class members and the Defendants over how consumers became "members" of their loyalty program and thus how much Plaintiffs and Class Members might be charged for the Wyndham Rewards program.

108.    By utilizing automatic enrollment with the intent or the effect of inflating the Plaintiffs' and class members' fees for Wyndham Rewards, the Defendants have breached their franchise agreements with Plaintiffs and members of the class and committed other unfair and deceptive acts.

109.    By utilizing Pro-Active matching with the intent or the effect of inflating the Plaintiffs' and class members' fees for Wyndham Rewards, the Defendants have breached their franchise agreements with Plaintiffs and members of the class and committed other unfair and deceptive acts.

110.    WYNDHAM and all of the Defendants have made participation in Pro-Active Matching mandatory for all of Defendants' franchisees, including all class members.

111.    Defendants have informed their franchisees that failure to participate and pay monthly Pro-Active matching fees will result in denial of franchise rights.

112.     As a result of Pro-Active Matching, the class members are then required to pay an additional franchise fee of five percent (5%) of gross room sales for customers who stay in these properties and whose stays are identified through Pro-Active Matching. This additional franchise fee is invoiced by Defendants on a monthly basis as a condition of a franchisee remaining in good standing.

113.     Franchisees have no means to opt out of Pro-Active Matching or to protest fees other than to attempt to terminate their franchise agreement. However, if a franchisee terminates its franchise agreement, it is subject to stiff penalties including future royalty payments for the remainder of the contract period at unfair and other unreasonable assessments, which may range from one thousand dollars ($1,000.00) to two thousand dollars ($2,000.00) per guest room.

114.     The Pro-Active Matching charges constitute unfair and unreasonable burdens to existing franchisees, who have abided by the terms of long standing franchise agreements with Defendants.

115.     Further, these unwarranted charges are being imposed upon already struggling franchisees and are unreasonable, and are exacerbated during difficult economic times and in a period of ongoing decline in hotel attendance.

### Franchise Agreements

116.     In or around November 30, 1994, the Defendants began offering the Plaintiffs the subject franchise agreements, exemplar copies of which are attached as **Exhibits "A" – "C"** and **"G" -- "N"**, to prospective franchisees.

117.     The Defendants have continued to offer such franchise agreements or various iterations thereof to their branded franchisees through and including the present date.

118.    The franchise agreements are for a fixed and set duration of multiple years, ranging from fifteen (15) to twenty (20) years.

119.    "Franchise fees" are defined in the standard franchise agreement to include a royalty fee ranging from a rate of 4% -- 6.5% of gross room revenues.

120.    The standard franchise agreement provides for the payment of two recurring fees generally described as follows: (1) an ongoing monthly "franchise fee" ranging from 4% -- 6.5% of all gross room sales for the duration of the agreement; and (2) a 'reservation system user fee' or a 'systems assessment fee' as an additional monthly fee ranging from 2% -- 3.5% of all gross room sales for the duration of the agreement.   These 'system fees' include the "marketing and reservation" fees described in Wyndham's Annual Report.   In each of the agreements, the fees are expressly limited to use for purposes of reimbursement of Wyndham's costs and operating expenses.   These fees are paid through monthly assessments on a franchisee's gross room sales as set forth and disclosed in the franchise agreement.

121.    The franchise agreements for those franchisees who comprise **Subclasses I** through **Subclass IV**, expressly and implicitly required systems assessment fees be collected and used by Wyndham only for "reasonable" operational and marketing services.

122.    By charging, using, and retaining system assessment fees for purposes other than operational and marketing services, Defendants have breached the express and implicit terms of the franchise agreements.

123.    However, the franchise agreements for those franchisees who comprise **Subclass I** and **Subclass II**, make no reference to the payment of any charge attributable to stays by loyalty reward members, whether or not identified through the practice of Pro-Active Matching,

and do not provide for additional, extra-contractual charges to be assessed by Defendants against franchisees.

124.    Although the franchise agreements executed by the Plaintiffs who comprise **Subclass III** make reference to the payment of a monthly charge for qualifying stays by loyalty rewards members, the agreements do not define how a guest becomes a "member" nor do they suggest that all customers might automatically be enrolled as "members", that the meaning of the term "member" might be dramatically redefined completely out-of-keeping with industry practice or with prior methods for determining membership employed by Wyndham or the Defendants, or that Wyndham would award these points to the phantom members without any affirmative action such as the member requesting the points or showing a membership card.

125.    Although the franchise agreements executed by the Plaintiffs who comprise **Subclass IV** make reference to the payment of a monthly charge for qualifying stays by loyalty rewards members, and state that such members may be Pro-Actively matched, the agreements do not define how a guest becomes a "member" nor do they suggest that all customers might automatically be enrolled as "members" or that the meaning of the term "member" might be dramatically redefined completely out-of-keeping with industry practice or with prior methods for determining membership employed by Wyndham or the Defendants.

126.    The practices of automatic enrollment, Pro-Active Matching, and the consequential dramatic imposition of an entirely new and additional franchise fee of up to five percent (5%) of gross room sales is not part of nor contemplated by the franchise agreement and thus is a breach of the express and implied provisions of the contract for the Plaintiffs who comprise **Subclasses I-IV**.

**The Increase of Marketing and System Fees After the Contracts Were Entered**

127.    The subject franchise agreements provide for a franchise fee known as a "Royalty Fee" to be paid to the franchisor Defendants ranging in amount from 4% -- 6.5% of gross room sales to be paid by the Plaintiff Franchisees and class members (collectively herein referred to as either "Plaintiffs" or "Franchisees") on a monthly basis to the Defendant Franchisors (collectively herein "Defendants" or "Franchisors")

128.    The franchise agreements also contain a second fee called a "System Fee" for an additional sum ranging from 3% -- 3.5% of gross room sales to be paid by the franchisee to the franchisor on a monthly basis (otherwise known as a "System Fee").  The System Fee is specifically designated for advertising, reservations, and related activities.

129.    The Defendants have required the Plaintiffs and other similarly situated franchisees to pay an additional (third) fee  (hereinafter, "Additional Fee") not included in some of the franchise agreements of up to 5% of gross room sales generated from hotel stays by customers who are so-called members of WYNDHAM's frequent stay or loyalty program known as "Wyndham Rewards." The additional extra contractual fee is supposedly for marketing, but with no explanation as to why it is imposed if the system fee is designated for marketing.

130.    By imposing the Additional Fee after execution of the franchise agreements, the Defendants have breached their franchise agreements with Plaintiffs and members of the class and committed other unfair and deceptive acts.

131.    Yet, based upon stays at Wyndham hotels by Wyndham Rewards hotel customers, Wyndham siphons off an additional 5% (five percent) of the revenue generated by the Wyndham Rewards customer's stay without any contractual basis for the fee charged in addition to the "Royalty Fee" and in addition to the "System Fee."  Because of customers becoming members of Wyndham

Rewards without knowledge, the membership base of Wyndham Rewards has been artificially inflated by Wyndham.

132.    As of December 31, 2010, Wyndham Rewards has approximately 23.4 million members.  The number of the current membership of Wyndham Rewards that became a member through conversion of a prior loyalty program to Wyndham Trip Rewards is in the possession of Defendant(s).

133.    For every one of the members and "Pro-Active Match" "members" the unwritten fee of up to five percent (5%) of gross room revenues is paid by Plaintiffs and the class members – yet, nothing is paid by Wyndham Rewards in reward points redemption to increase customer loyalty –the customer is unaware of his or her membership, the points awarded or how to redeem points for "rewards."  Marketing and use of the reservation system are already paid for by franchisees under fee provisions written into the contract of as much as ten percent (10%).  No consideration supports the additional fee of up to five percent (5%) of gross room revenues for the Wyndham Rewards program and Wyndham has violated covenants of good faith and fair dealing with its franchisees by demanding the additional fee that is not provided for under the written terms of the Franchise Agreements.

134.    Because of Wyndham's actions, Plaintiffs have retained the undersigned attorneys to whom they are obligated to pay a reasonable fee.

135.    In essence, the Defendants have created a group of reward members, many of whom are not even aware of that status, and siphoned an additional fee not in the contract for five percent (5%) of the gross room sales revenue from the Plaintiff franchisees in relation to the stays of these reward members and without any contractual or other basis to do so.  The services "paid for" by this fee are, according to the terms of the contract, covered by and provided under terms written into the contract.

136.    Plaintiffs accordingly seek damages against the Defendants on their own behalf and on behalf of their respective representative class members, in addition to attorneys' fees and costs, interest, and other appropriate relief.

137.    All conditions precedent to the institution of this litigation have been fulfilled or waived.

## COUNT I - BREACH OF CONTRACT

138.    Plaintiff, SHAKTI INVESTMENT, INC., on behalf of itself and members of Subclass I, realleges and reincorporates the allegations contained within **paragraphs 1 through 137** above as if fully set forth herein.

139.    Plaintiff, MHB, LLC, and RAM-LAKHAN, INC., on behalf of itself and members of Subclass II, realleges and reincorporates the allegations contained within **paragraphs 1 through 137** above as if fully set forth herein.

140.    This is an action for breach of contract against all Defendants who have offered or are offering franchise agreements to franchisees of the type identified in **Subclass I** and **Subclass II**.

141.    The franchise agreements, exemplar copies of which are attached hereto as **Exhibit "C" and Exhibit "G"** have been executed between each subclass member and the Defendants, and constitute enforceable, express, written contracts.

142.    The subject contracts were drafted by the Defendants and, accordingly, are to be construed against the Defendants as their drafter.

143.    By implementing its automatic enrollment and Pro-Active Matching program as part of the Wyndham Rewards program upon the Plaintiff franchisees, the Defendants have

artificially inflated the rolls of the Wyndham Rewards membership program thereby improperly inflating and overcharging Plaintiffs in breach of the express terms of the agreements.

144.    By implementing its automatic enrollment and Pro-Active Matching program as part of the Wyndham Rewards program upon the Plaintiff franchisees, the Defendants have artificially inflated the rolls of the Wyndham Rewards membership program thereby improperly inflating and overcharging Plaintiffs in breach of the implied terms of the agreement.

145.    By enacting and implementing its Pro-Active Matching program upon the Plaintiff franchisees, the Defendants have unilaterally assessed an additional, mandatory franchise fee of five percent (5%) of gross room sales upon franchisees for each and every hotel and motel stay by Pro-Active Matched Members, irrespective of whether the customer has elected to stay at a WYNDHAM branded property because of his or her status as a Wyndham Rewards member or sought to become a Wyndham Rewards member or sought to become a WYNDHAM Rewards member, all in violation of the language of the franchise agreements.  The additional franchise fee of five percent (5%) of gross room sales for each and every hotel and motel customer and not merely those who choose to participate in a rewards program, as imposed by the Pro-Active Matching program, means that the class members, instead of paying a franchise fee ranging from four percent (4%) to six and one-half percent (6.5%) of gross room sales, plus an additional sum ranging from two percent (2%) to three and one-half percent (3.5%) of gross room sales or for a total fee of up to ten percent (10%) are now required to pay a total monthly franchise fee of up to fifteen percent (15%) of gross room sales.

146.    The unilateral attempt by the Defendants to add this additional fee constitutes impermissible and excessive fees which are not authorized to be charged according to the terms of the franchise agreements.

147.    By engaging in an actual and de facto policy of covertly effectuating the program, refusing and denying information to Plaintiffs and those requesting information on their behalf, and retaliating against certain Plaintiffs for their involvement in this lawsuit, Wyndham has acted in bad faith and breached the implied covenant of good faith and fair dealing.

148.    By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the franchise agreements with Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., and all members of Subclass I and Subclass II.

149.    By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the implied obligation of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., and all members of Subclass I and Subclass II.  Defendants knew or should have known that the effect of the automatic enrollment and Pro-Active Matching program would be to frustrate, undermine, and prohibit Plaintiff franchisees from realizing the objectives of their agreements with Defendants.

150.    As a direct result of the contract violation by the Defendants, the Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., and all members of Subclass I and Subclass II, have been injured and damaged in an amount to be determined by the trier of fact. The subclass members are entitled to recover all damages resulting from this breach.

151.    As a direct result of the breach of the implied obligation of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., and all members of Subclass I and Subclass II have been

injured and damaged in an amount to be determined by the trier of fact. The subclass members are entitled to recover all damages resulting from this breach of implied obligation of good faith.

152. Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., together with all respective members of Subclass I and Subclass II, are entitled to recover their attorneys' fees in bringing this action, as set forth in the franchise agreements. *See*, for example, paragraph 17.4 of **Exhibit "C."**

WHEREFORE, Plaintiffs, SHAKTI INVESTMENT, INC., MHB, LLC, and RAM-LAKHAN, INC., together with all respective members of Subclass I and Subclass II, respectfully request this Court enter an order certifying that this action may be maintained as a class action, awarding damages against the Defendants in favor of Plaintiffs in an amount well in excess of $5,000,000.00, together with attorneys' fees and costs, and any and all such further relief as this Court deems just and proper.

## COUNT II - BREACH OF CONTRACT

153. Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL and SHIVA INVESTMENTS, LLC, on behalf of themselves and members of Subclass III, reallege and reincorporate the allegations contained within **paragraphs 1 through 137** above as if fully set forth herein.

154. Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, on behalf of themselves and all members of Subclass IV, reallege and reincorporate the allegations contained within paragraphs 1 through 136 above as if fully set forth herein.

155.    This is an action for breach of contract against all Defendants who have offered or are offering franchise agreements to franchisees of the type identified in **Subclass III** and **Subclass IV**.

156.    The franchise agreements, exemplar copies of which are attached hereto as **Exhibit "A," Exhibit "B," Exhibit "H," Exhibit "I," Exhibit "J," Exhibit "K," Exhibit "L," Exhibit "M," and Exhibit "N"** have been executed between each subclass member and the Defendants, and constitute enforceable, express, written contracts.

157.    The subject contracts were drafted by the Defendants and, accordingly, are to be construed against the Defendants as their drafter.

158.    By implementing its automatic enrollment and Pro-Active Matching program as part of the Wyndham Rewards program upon the Plaintiff franchisees, the Defendants have artificially inflated the rolls of the Wyndham Rewards membership program thereby improperly inflating and overcharging Plaintiffs in breach of the express terms of the agreements.

159.    By implementing its automatic enrollment and Pro-Active Matching program as part of the Wyndham Rewards program upon the Plaintiff franchisees, the Defendants have artificially inflated the rolls of the Wyndham Rewards membership program thereby improperly inflating and overcharging Plaintiffs in breach of the implied terms of the agreement.

160.    By assessing, retaining, using, and carrying over the monthly franchise fee of up to five percent (5%) of gross room sales for all room sales to all customers who may be reward members as a profit making vehicle as opposed to assessing, retaining, and using these fees only for purposes of the operation, marketing, and maintenance of the program, Defendants have breached the express terms of the agreements and the implied covenants of good faith and fair dealing.

161.    By engaging in an actual and de facto policy of covertly effectuating the program, refusing and denying information to Plaintiffs and those requesting information on their behalf, and retaliating against certain Plaintiffs for their involvement in this lawsuit, Wyndham has acted in bad faith and breached the implied covenant of good faith and fair dealing.

162.    The additional franchise fee of five percent (5%) of gross room sales for each and every hotel and motel customer and not merely those who choose to participate in a rewards program, as imposed by the Pro-Active Matching program, means that the class members, instead of paying a franchise fee ranging from four percent (4%) to six and one-half percent (6.5%) of gross room sales, plus an additional sum ranging from two percent (2%) to three and one-half percent (3.5%) of gross room sales or for a total fee of up to ten percent (10%) are now required to pay a total monthly franchise fee of up to fifteen percent (15%) of gross room sales.

163.    The unilateral attempt by the Defendants to add this additional fee constitutes impermissible and excessive fees which are not authorized to be charged in any of the provisions of the franchise agreements.  Nothing distinguishes the Wyndham Rewards program from other marketing promised by Wyndham in the franchise agreements and paid for under the System fees.

164.    The Pro-Active Matching program leverages excess charges which were not bargained for nor contemplated in the schedule of fees provided in the franchise agreements.

165.    By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the franchise agreements with Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, SHIVA INVESTMENTS, LLC, and all members of Subclass III.

166.    By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the implied obligation

of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, SHIVA INVESTMENTS, LLC, and all members of Subclass III.   Defendants knew or should have known that the effect of the automatic enrollment and Pro-Active Matching program would be to frustrate, undermine, and prohibit Plaintiff franchisees from realizing the objectives of their agreements with Defendants.

167.    As a direct result of the contract violation by the Defendants, the Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, and SHIVA INVESTMENTS, LLC, and all members of Subclass III have been injured and damaged in an amount to be determined by the trier of fact.   The subclass members are entitled to recover all damages resulting from this breach.

168.    As a direct result of the breach of the implied obligation of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, and SHIVA INVESTMENTS, LLC, Plaintiffs and all members of Subclass III have been injured and damaged in an amount to be determined by the trier of fact.   The subclass members are entitled to recover all damages resulting from this breach of implied obligation of good faith.

169.    Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, and SHIVA INVESTMENTS, LLC, together with all respective members of Subclass III, are entitled to recover their attorneys' fees in bringing this action, as set forth in the franchise agreements.  *See*, for example, paragraph 17.4 of **Exhibit "B**."

170.    By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the franchise agreements with Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT

HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, and all members of Subclass IV.

171. By imposing extra-contractual fees upon franchisees by virtue of forced participation in its Pro-Active Matching program, the Defendants have materially breached the implied obligation of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, and all members of Subclass IV. Defendants knew or should have known that the effect of the automatic enrollment and Pro-Active Matching program would be to frustrate, undermine, and prohibit Plaintiff franchisees from realizing the objectives of their agreements with Defendants.

172. As a direct result of the contract violation by the Defendants, the Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, and all members of Subclass IV have been injured and damaged in an amount to be determined by the trier of fact. The subclass members are entitled to recover all damages resulting from this breach.

173. As a direct result of the breach of the implied obligation of good faith and fair dealing that exists in the subject franchise agreements with Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC. Plaintiffs and all members of Subclass IV have been injured and damaged in an amount to be determined by the trier of fact. The subclass members are entitled to recover all damages resulting from this breach of implied obligation of good faith.

174. Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, and all members of

Subclass IV, are entitled to recover their attorneys' fees in bringing this action, as set forth in the franchise agreements.  See, for example, paragraph 17.4 of Exhibit "A."

WHEREFORE, Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL, and SHIVA INVESTMENTS, LLC, together with all respective members of Subclass III, and AMAR SHAKTI ENTERPRISES, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, and all members of Subclass IV, respectfully request this Court enter an order certifying that this action may be maintained as a class action, awarding damages against the Defendants in favor of Plaintiffs in an amount well in excess of $5,000,000.00, together with attorneys' fees and costs, and any and all such further relief as this Court deems just and proper.

## COUNT III – VIOLATION OF UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS – Fla. Stat.,§ 501.201,  et seq

175.    Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, and ORLANDO LODGING ASSOCIATES, LLP, on behalf of itself and all members of the class, including members of all subclasses, reallege and reincorporates the allegations contained within **paragraphs 1 through 137** above as if fully set forth herein.

176.    This is an action for damages for violation of the Florida Deceptive and Unfair Trade Practices Act (hereinafter "FDUTPA"), Fla. Stat. §501.201, et seq, by which numerous numbers of the class have a cause of action against the Defendants by virtue of actions taken and damages accruing in Florida.[7]

177.    In particular, prevailing law provides for damages arising by virtue of misleading oral or written statements that have the capacity, tendency, or effect of deceiving and/or

---

[7] The elements of the cause of action, as set forth herein, apply in the same manner as if asserted under the deceptive and unfair trade practice laws of other jurisdictions in the United States, including New Jersey and South Dakota.

misleading others and such damages are quantified by the amounts of the unlawful charges imposed upon Plaintiffs and their class.

178.    Plaintiffs and all class members, including members of all subclasses, relied on misrepresentations and omissions made by Defendants regarding a) what charges they would be expected to pay as franchisees, b) how any rewards program would operate, c) how the Defendants would define and identify "members" of that program, d) how Defendants would award points in that program, e) how system assessment and other such fees would be collected, used, and retained only for reasonable operating and marketing expenses, and were thereby induced to become franchisees or to otherwise continue their franchise relationships with Defendants.

179.    In its Pro-active Matching program, WYNDHAM has directed and the Defendants have assessed an additional, mandatory franchise fee of up to five percent (5%) of gross room sales upon franchisees for each and every hotel and motel customer whose stay is Pro-actively matched irrespective of whether the customer chooses to participate in any rewards program and/or present a rewards card upon check in, all of which is in violation of the language of the franchise agreements.

180.    The additional franchise fee of five percent (5%) of gross room sales for each and every hotel and motel customer whose stay is Pro-actively matched and not merely those who choose to participate in a rewards program, as imposed by the Pro-active Matching program, means that the class members, instead of paying a franchise fee ranging from four percent (4%) to six and one-half percent (6.5%) of gross room sales, plus an additional sum ranging from two percent (2%) to three and one-half percent (3.5%) of gross room sales for a total fee of up to ten percent (10%) are now required to pay a total monthly franchise fee of up to fifteen percent (15%) of gross room sales for all loyalty

reward customers, which constitute impermissible and excessive fees which are not authorized to be charged in any of the provisions of the franchise agreements.

181.    The automatic enrollment of individuals based upon their failure to "opt out" of the membership program by unchecking a box on Wyndham's website artificially inflated the rolls of the Rewards Program by millions of individuals and thereby grossly overcharged Plaintiffs and class members in violation of the express and implicit provisions of the agreements as set forth above.

182.    The automatic enrollment and Pro-active Matching programs assess excess charges which were not bargained for nor contemplated in the schedule of fees provided in the franchise agreements.

183.    The mandatory extra-contractual fees imposed upon franchisees by virtue of the automatic enrollment of "members" and the forced participation of Plaintiffs in the Pro-active Matching program constitutes unfair and deceptive trade practices as contemplated by law as more particularly described in the foregoing paragraphs and also for the following reasons:

(a)    The enrollment of customers in a rewards program without their affirmative knowledge and consent, wherein they have to knowingly opt out upon making an on-line reservation, has artificially inflated the membership rewards base by at least 1,000,000 members, increasing the Defendants' incoming profit substantially.

(b)    Defendants' monthly statements, which are sent to franchisees, hide and mask reference to those guests whose hotel stays are Pro-actively matched, making it almost impossible to determine how the rewards fee is calculated and which guests were Pro-actively matched.

(c)    The practice of awarding points to customers who stay at

Defendants' properties and do not know they are Wyndham Rewards members, do not know they have been awarded loyalty reward points, and never use their points before the points automatically expire, is offensive and unlawful.

(d)     The franchise agreement is presented to the franchisee on a "take it or leave it" basis, evidencing the franchisor's uneven bargaining power with the franchisee.

(e)     The actual and de facto policy of rebuffing, refusing, and ignoring requests for information by and on behalf of the Plaintiffs and class members about the operation, accounting, and expenditures of the program, was offensive and unlawful, especially where such information was uniquely and exclusively within the control and possession of Defendants, and especially when combined with Wyndham's retaliatory actions towards Plaintiffs involved in this suit attempting to enforce their rights under state and federal laws.

184.    The foregoing acts committed by Defendants constitute unfair and deceptive trade practices in the conduct of trade or commerce.

185.    Plaintiffs and all class members, having relied on the misrepresentations made by Defendants regarding what charges they would be expected to pay as franchisees, and by subsequently having been charge additional arbitrary fees have been subjected to acts by the Defendants that offend established public policy and are oppressive, unscrupulous and substantially injurious to franchisees, who are consumers pursuant to FDUTPA.

186.    Not only did Plaintiffs and class members rely on the misrepresentations of Defendants to their detriment, but such actions by Defendants constitute the type of conduct likely to deceive other consumers acting reasonably in the same circumstances.

187.     As a direct result of the unfair and deceptive practices of the Defendants, Plaintiffs and all class members have been directly injured and have incurred actual damages in amounts equal to those excess fees which have been unlawfully charged to them.

188.     Based on the foregoing violations of law, Plaintiffs and all class members are entitled to recover all actual damages resulting from this conduct, together with costs and attorneys' fees, in addition to pursuing all other legal remedies.

WHEREFORE, Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, and ORLANDO LODGING ASSOCIATES, LLP, together with all respective class members, respectfully request this Court enter an order certifying that this action may be maintained as a class action, awarding damages against the Defendants in favor of Plaintiffs in an amount in excess of $260,000,000.00, together with attorneys' fees, and all such further relief as this Court deems just and proper.

### COUNT IV – VIOLATION OF CONSUMER FRAUD ACT (CFA), N.J.S.A. 56:8-1  et seq

184.     Plaintiff, SHAKTI INVESTMENT, INC., on behalf of itself and members of Subclass I, reallege and reincorporate the allegations contained within paragraphs 1 through 137 above as if fully set forth herein, and in the alternative allege:

185.     Plaintiff, RAM-LAKHAN, INC., on behalf of itself and members of Subclass II, reallege and reincorporate the allegations contained within paragraphs 1 through 136 above as if fully set forth herein, and in the alternative allege:

186.     Plaintiffs, ORLANDO LODGING ASSOCIATES, LLP, NATU PATEL and SHIVA INVESTMENTS, LLC, on behalf of themselves and members of Subclass III, reallege and reincorporate the allegations contained within paragraphs 1 through 136 above as if fully set forth herein.

187.   Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, MHB, LLC, CABOT HOSPITALTIY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, on behalf of themselves and all members of Subclass IV, reallege and reincorporate the allegations contained within paragraphs 1 through 136 above as if fully set forth herein.

188.   This is an action for damages for violation of the New Jersey Consumer Fraud Act (hereinafter "NJCFA"), N.J.S.A. 56:8-1, et seq, by which numerous numbers of the class have a cause of action against the Defendants by virtue of actions taken and damages accruing in New Jersey.

189.   In particular, prevailing law provides for damages arising by virtue of misleading oral or written statements that have the capacity, tendency, or effect of deceiving and/or misleading others and such damages are quantified by the amounts of the unlawful charges imposed upon Plaintiffs and their class.

190.   Plaintiffs and all class members, including members of all subclasses, relied on misrepresentations and omissions made by Defendants regarding a) what charges they would be expected to pay as franchisees, b) how any rewards program would operate, c) how the Defendants would define and identify "members" of that program, d) how Defendants would award points in that program, e) how system assessment and other such fees would be collected, used, and retained only for reasonable operating and marketing expenses, and were thereby induced to become franchisees or to otherwise continue their franchise relationships with Defendants.

191.   In its Pro-active Matching program, WYNDHAM has directed and the Defendants have assessed an additional, mandatory franchise fee of up to five percent (5%) of gross room sales upon franchisees for each and every hotel and motel customer whose stay is

Pro-actively matched irrespective of whether the customer chooses to participate in any rewards program and/or present a rewards card upon check in, all of which is in violation of the language of the franchise agreements.

192.    The additional franchise fee of five percent (5%) of gross room sales for each and every hotel and motel customer whose stay is Pro-actively matched and not merely those who choose to participate in a rewards program, as imposed by the Pro-active Matching program, means that the class members, instead of paying a franchise fee ranging from four percent (4%) to six and one-half percent (6.5%) of gross room sales, plus an additional sum ranging from two percent (2%) to three and one-half percent (3.5%) of gross room sales for a total fee of up to ten percent (10%) are now required to pay a total monthly franchise fee of up to fifteen percent (15%) of gross room sales for all loyalty reward customers, which constitute impermissible and excessive fees which are not authorized to be charged in any of the provisions of the franchise agreements.

193.    The automatic enrollment of individuals based upon their failure to "opt out" of the membership program by unchecking a box on Wyndham's website artificially inflated the rolls of the Rewards Program by millions of individuals and thereby grossly overcharged Plaintiffs and class members in violation of the express and implicit provisions of the agreements as set forth above.

194.    The automatic enrollment and Pro-active Matching programs assess excess charges which were not bargained for nor contemplated in the schedule of fees provided in the franchise agreements.

195.    The mandatory extra-contractual fees imposed upon franchisees by virtue of the automatic enrollment of "members" and the forced participation of Plaintiffs in the Pro-active

Matching program constitutes unfair and deceptive trade practices as contemplated by law as more particularly described in the foregoing paragraphs and also for the following reasons:

(a)   The enrollment of customers in a rewards program without their affirmative knowledge and consent, wherein they have to knowingly opt out upon making an on-line reservation, has artificially inflated the membership rewards base by at least 1,000,000 members, increasing the Defendants' incoming profit substantially.

(b)   Defendants' monthly statements, which are sent to franchisees, hide and mask reference to those guests whose hotel stays are Pro-actively matched, making it almost impossible to determine how the rewards fee is calculated and which guests were Pro-actively matched.

(c)   The practice of awarding points to customers who stay at Defendants' properties and do not know they are Wyndham Rewards members, do not know they have been awarded loyalty reward points, and never use their points before the points automatically expire, is offensive and unlawful.

(d)   The franchise agreement is presented to the franchisee on a "take it or leave it" basis, evidencing the franchisor's uneven bargaining power with the franchisee.

(e)   The actual and de facto policy of rebuffing, refusing, and ignoring requests for information by and on behalf of the Plaintiffs and class members about the operation, accounting, and expenditures of the program, was offensive and unlawful, especially where such information was uniquely and exclusively within the control and possession of Defendants, and especially when combined with Wyndham's retaliatory actions towards Plaintiffs involved in this suit attempting to enforce their rights under state and federal laws.

196.   The foregoing acts committed by Defendants constitute unfair and deceptive trade

practices in the conduct of trade or commerce.

197.    Plaintiffs and all class members, having relied on the misrepresentations made by Defendants regarding what charges they would be expected to pay as franchisees, and by subsequently having been charge additional arbitrary fees have been subjected to acts by the Defendants that offend established public policy and are oppressive, unscrupulous and substantially injurious to franchisees, who are consumers pursuant to NJCFA.

198.    Not only did Plaintiffs and class members rely on the misrepresentations of Defendants to their detriment, but such actions by Defendants constitute the type of conduct likely to deceive other consumers acting reasonably in the same circumstances.

199.    As a direct result of the unfair and deceptive practices of the Defendants, Plaintiffs and all class members have been directly injured and have incurred actual damages in amounts equal to those excess fees which have been unlawfully charged to them.

200.    Based on the foregoing violations of law, Plaintiffs and all class members are entitled to recover all actual damages resulting from this conduct, together with costs and attorneys' fees, in addition to pursuing all other legal remedies.

WHEREFORE, Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, ORLANDO LODGING ASSOCIATES, LLP, SHAKTI INVESTMENT, INC., RAM-LAKHAN, INC., NATU PATEL, SHIVA INVESTMENTS, LLC, MHB, LLC, CABOT HOSPITALITY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, together with all respective class members, respectfully request this Court enter an order certifying that this action may be maintained as a class action, awarding damages against the Defendants in favor of Plaintiffs in an amount in excess of $260,000,000.00, together with attorneys' fees, and all such further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues permissible by law.

Dated this 19th day of October, 2011.

Respectfully Submitted,

Plaintiffs, by One of Their Counsel,

/s/ Mark Fistos
Mark Fistos, Esq.
mark@pathtojustice.com
Florida Bar No. 909191
**Farmer, Jaffe, Weissing,
Edwards, Fistos & Lehrman, PL**
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
(954) 524-2822 fax

Richard Wolfe, Esq.
FLBN 355067
Farrell & Patel, of Counsel
The Four Seasons Tower
1425 Brickell Ave., Suite 58C
Miami, FL  33131
Office: 305-798-4177
Fax: 1-800-946-6711

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 19, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Mark Fistos
Mark Fistos, Esq.

**<u>SERVICE LIST</u>**

**Christopher Posteraro**
**Daniel A. Bress**
**Eugene F. Assaf**
Kirkland & Ellis, LLP
Suite 1200
655 15th St NW
Washington, DC 20005
202/879-5000
Fax: 202/879-5200
Email: cposteraro@kirkland.com

**Mary Leslie Smith**
Foley & Lardner, LLP
Suite 1900
2 S Biscayne Blvd
Miami, FL 33131-1808
305/482-8400
Fax: 305/482-8600
Email: mlsmith@foley.com

**Benjamin H. Hill, III**
State Attorney's Office
419 N. Pierce Street
Tampa, FL 33602-4022
813/221-3900
Fax: 813/221-2900
Email: bhill@hwhlaw.com

**Dennis Parker Waggoner**
Hill Ward Henderson, P.A.*
101 E. Kennedy Blvd. – Ste. 3700
PO Box 2231
Tampa, FL 33601-2231
813/221-3900
Fax: 813/221-2900
Email: dwaggoner@hwhlaw.com