UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

AMAR SHAKTI ENTERPRISES, LLC, *et al*,

       Plaintiffs,

vs.

WYNDHAM WORLDWIDE, INC., *et. al*,

       Defendants.

CASE NO: 6:10-cv-01857-GAP-KRS

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Plaintiffs, AMAR SHAKTI ENTERPRISES, LLC, ORLANDO LODGING ASSOCIATES, LLP, SHAKTI INVESTMENT, INC., RAM-LAKHAN, INC., NATU PATEL, SHIVA INVESTMENTS, LLC, MHB, LLC, CABOT HOSPITALITY, LLC, BAL KISHAN, INC., and TESHARA INVESTMENTS, LLC, (collectively hereinafter, the "Plaintiffs"), by and through their undersigned counsel, respectfully submits this *Opposition to Defendants' Motion to Dismiss the Second Amended Complaint*, and states as follows:

## I.    INTRODUCTION

The Plaintiffs in this putative class action are Indian-American franchisees who at long last, have brought claims against Wyndham Worldwide Inc. (and its subsidiaries, collectively "Wyndham" or "Defendants") for Wyndham's near decade-long orchestration of a subtle, yet effective scam, involving the loyalty program Wyndham Rewards, that is not far akin from a typical pyramid scheme. Wyndham wrongfully and without authority imposed a higher fee for a loyalty program than the contracts of certain class members permitted. Wyndham's misconduct here is a simple breach of contract, in fact breach of thousands of contracts, as has been soundly recognized recently by other federal courts. Second, contrary to industry standard, the prior experience of the Plaintiffs, and *every shred of extensive nationwide* advertisements, internal memoranda, and all other pronouncements from Wyndham associated with its Rewards Program,

1

Wyndham made changes and additions to its Rewards Program so as to allow for the creation of "phantom rewards members" – that is guests who did not affirmatively choose to be in a rewards program, may not have known or cared that they were in a rewards program, for whom, nonetheless, Wyndham billed hotel owners across the country. Wyndham never told the truth about what it was doing, despite repeated inquiries.

## II.　　LEGAL STANDARD

"In a motion to dismiss, whether it is a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim, the Court is required to construe the complaint in the light most favorable to the plaintiff, and accept all the facts alleged by the plaintiff as true." *Morris v. ADT Sec. Services,* 580 F.Supp.2d 1305, 1308 (S.D. Fla. 2008) (citations omitted).

## III.　　ARGUMENT

The New Jersey Consumer Fraud Act does apply to the deceit and unconscionable business practices that have been alleged in the SAC. Moreover, the Plaintiffs' status as franchisees of Defendant Wyndham is not, as they would lead this Court to believe, some *per se* disqualifying character. The simple fact is that the NJCFA is extremely broad. Courts are directed to err on the side of inclusion of claims, rather than preclusion. Its history is one of expansion because it is aimed at protecting those who are buying in the marketplace from being deceived and misled by those sellers who have superior knowledge and bargaining power. There is no overly rigid formalism allowed – either in the interpretation of the statute or the application of the case law. Indeed, this Court's analysis must be performed on a case-by-case application of the language and purpose of the statute and principles underlying the case law. And, the only law by which this Court is here bound in its analysis is that from the state of New Jersey. The inquiry is what is the binding law of New Jersey, what has the Supreme Court of New Jersey ruled on this issue or what would it rule if faced with the issue. As noted below, the Supreme

Court of New Jersey has not ruled on the specific issue here but according to its last pronouncement – and the most recent rulings from the Appellate courts of New Jersey, the NJCFA is definitively applicable *under these unique circumstances*.

First, the Defendants have put forth an extremely narrow, formalistic, overly-cramped interpretation of the NJCFA that does not even come close to doing justice to its true nature. Not every sale in the market place can support a cause under the act by every victim, *however*, the NJCFA is aimed at eradicating the admittedly nebulous, shifting, and constantly evolving world of consumer fraud. *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 264, 696 A.2d 546 (1997) (In enacting the CFA, it was intended "that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud.") New Jersey Courts consistently emphasize that that the history of the act is one "of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604 (1997). The expansion is a direct result of the fact that new technologies produce new opportunities for deceit and ingenious, well funded entities such as Wyndham produce new scams. *See Lemelledo*, supra, 150 N.J. at 265, 696 A.2d 546. It is for these reasons that the NJCFA is "one of the strongest consumer protection laws in the nation," *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 555 (2009), and for these same reasons that the New Jersey Supreme Court has directed that the NJCFA must "be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994); *539 Absecon Boulevard, L.L.C. v. Shan Enters. Ltd. P'ship*, 406 N.J.Super. 242, 274 (App. Div.) (CFA "should be liberally construed to accomplish its dual objectives of deterrence and protection.")

A.     **The NJCFA Prohibits the Misleading, Dishonest, and Unconscionable Statements and Uniform Omissions Wyndham Made About Its Wyndham**

**Rewards Related Services, <u>and</u> it Prohibits Wyndham's Unconscionable Conduct in Relation to "Subsequent Performance" of those Services.**

First, Wyndham's misconduct is covered by the NJCFA because Wyndham made misrepresentations and uniform omissions about the "services" it would provide as part of the Wyndham Guest Rewards Loyalty Program and the NJCFA broadly defines "merchandise" to include "services." Evidence adduced through discovery and at trial will show that the nature of the Guest Rewards Program was such that the Plaintiffs were paying Wyndham to administer and advertise a program that would incentivize hotel guests to choose for their stay a Wyndham branded hotel, and to return to a Wyndham branded hotel, instead of the competition. As set forth in the SAC, every franchise agreement, in fact contains language that expressly limits the purpose for which Wyndham could collect or use the 5% fee to reimbursement of Wyndham's reasonable expenses incurred in operating and marketing the Rewards Program. Thus, Wyndham's misrepresentations and uniform omissions regarding how it would charge the Plaintiffs for the program, who would be made "members" of the program and on what terms, how Wyndham would use the fees it collected, and about the magnitude and success of the program -- all constitute prohibited conduct about a "service" and as such, is expressly included within the Act's definition of "merchandise."

In this same context, Wyndham also employed deceitful, misleading, unconscionable conduct in connection with its *subsequent performance* of services, *i.e.,* its operation, administration, and marketing of the Wyndham Rewards Program after franchise agreements were signed. Wyndham made promises in its franchise agreement related to how it would carry out the Wyndham Rewards program, and Wyndham inherited promises about the same that it was bound to follow. However, Wyndham not only breached those contracts by breaking those promises, Wyndham carried its misconduct many aggravating steps beyond by erecting the full

scale architecture needed to carry out a massive scam. This architecture includes making changes to its online reservation system so as to automatically enroll every person who made a reservation for hotel stay but failed to uncheck a box. The architecture of the scam Wyndham erected included massive national advertising campaigns and the mass distribution of memoranda and instructional material to franchisees that misrepresented that members actively "enrolled" in the Wyndham Rewards program (as opposed to passively "were enrolled"), that misrepresented the size of the membership population and thereby misrepresented the success of the program. Wyndham went on to actually create mandatory monetary obligations for the Plaintiffs and every franchisee in the country that was based upon "phantom Rewards' members" who did not choose to be a part of the program and may not even have known they were enrolled, and that was based upon "member stand-ins" who were not Rewards members and according to the terms and conditions should not have been awarded points but due to proactive matching, nevertheless formed the basis for 5% per night charges to the Plaintiffs. The prior is a far from exhaustive limited sampling, based on the allegations in the SAC, of some of the myriad ways that Wyndham employed unconscionable misconduct in connection with its subsequent performance of services.

**B.      Under New Jersey Law, the NJCFA Applies to these Franchisees Under These Circumstances.**

In addition to the fact that the NJCFA prohibits deceitful and unconscionable conduct after the fact, i.e., in connection with the Defendant's subsequent performance, the NJCFA also applies under just these unique circumstances to prohibit a company such as Wyndham from making affirmative misstatements and uniform omissions of material fact. The Plaintiffs, and the franchisees they seek to represent, are either "consumers" or entitled to "consumer status" under the NJCFA based upon the unique circumstances of this case. First and foremost, there is

nothing on the face of the statute which categorically precludes or otherwise carves out parties to a franchise agreement from protection against a franchisor who has carried forth an extensive pattern of unconscionable and misleading misconduct. The statute itself is drafted broadly to protect those who relied upon, or were simply exposed to, the misconduct. *See* N.J.S.A. 56:8–2 (prohibiting unconscionable practices in the market place prior to or after the time contracting); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 2004 WL 3767338, *5 (N.J.Super.L., July 08, 2004) (NJCFA "actually uses the word "'person' not 'consumer.' . . . the word 'person' is not limited to individuals or to those who purchase personal or household items.") *Id.* at *5. New Jersey law has long recognized that the "consumer" which is the intended subject of the NJCFA's protection can include business entities. *See id.* at *5, *citing Marascio v. Campanella*, 298 N.J.Super. 491 (App.Div.1997), (corporation purchasing goods or services generally sold to the public is a consumer entitled to the protection of the Act); *Kavky v. Herbalife Intern. of America*, 359 N.J.Super. 497 (App.Div. 2003) (Appellate Court applied the Act to the purchase of a franchise finding that not to interpret the Act broadly would deny protection from "pyramid schemes and similar mass public frauds"), *citing Kugler v. Koscot Interplanetary, Inc.,* 120 N.J.Super. 216, 293 A.2d 682 (Ch.Div.1972) (NJCFA applied franchises to prohibit mass fraud) (citing other cases).

Indeed, New Jersey law has also recognized that franchisees may under appropriate circumstances bring claims under the NJCFA. For example, in *Kavky*, the Appellate Court expressly disagreed with highly formalistic and "unduly restrictive" analysis of the Third Circuit in *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1270-74 (3d Cir.1994), which ruled that franchisees were not entitled to protection under the NJCFA. The *Kavky* Court distinguished *J&R* noting that it involved a "substantial and complex" commercial

transaction and was covered by the New Jersey Franchise Practices Act.  *Id.* at 501.  According to the New Jersey Appellate Court, adopting the reasoning of *J&R* would have meant leaving citizens vulnerable to mass fraud.  *Id.*

As alleged in the SAC, Wyndham, *inter alia*, deliberately changed the terms according to which one became a "member" of the Rewards program to astronomically and deceitfully inflate the number of "members" to a) make the program appear larger and more successful than it actually was, and b) create an exponentially larger revenue stream based upon.   Wyndham also carried forth deceitful and misleading advertising campaign aimed at both franchisees and potential guests.  Indeed, the NJCFA's definition of advertisement is broad enough to encompass the direct and indirect effect of Wyndham's misstatements and material omissions.

Defendant Wyndham's Motion to Dismiss completely misses the mark because Wyndham fails to apprehend or acknowledge that the entirety of the misrepresentations and misconduct that victimized each of the Plaintiffs (and the classes they intend to represent) are based upon the services Wyndham promised to provide and did provide in connection with the Wyndham Rewards Guest Loyalty Program.

Some Plaintiffs would not have consummated their purchase of a Wyndham franchise had Wyndham been honest and completely accurate about the nature, size, costs, amount of fees, and true success of the Wyndham Rewards program.  None of the Plaintiffs would have agreed to the terms they did had Wyndham fully disclosed how its program worked or was intended to work.  None of the Plaintiffs would have continued to pay the amounts they did under the Agreements had Wyndham made full and complete disclosures.  Wyndham's unconscionable misconduct is abundantly similar to the type of mass frauds that New Jersey Courts have

permitted franchisees to bring suit under the NJCFA before. *See Kavky*, 359 N.J.Super. 497; *Kugler,* 120 N.J.Super. at 293. Wyndham made misrepresentations and uniform omissions and engaged in unconscionable subsequent performance in connection with its advertisement and sale of services to the public. Indeed, evidence adduced through discovery and at trial will demonstrate a dramatic and wholesale overlap between the nature, content, and objectives of Wyndham's mass marketing campaigns in USA Today, and other newspapers, and on television commercials, and elsewhere, to enroll new members into Wyndham Rewards, and the instructional materials, internal memoranda, speeches, and communications issued by Wyndham to the Plaintiffs and other franchisees about Wyndham Rewards – also urging the Plaintiffs to enroll new members into Wyndham Rewards.

Thus, Defendants' focus on case-law and analysis about whether or not franchises are or are not offered for sale to the public completely misses the mark. Whether or not franchises are "merchandise" under the NJCFA is irrelevant because the subject of the misrepresentations and the offers to the public was for the services Wyndham provided in connection with Wyndham Rewards. Those services were indeed offered and advertised to the public and to the Plaintiffs in a way that evidence will show was inextricably linked. For example, Wyndham advertised the nature and success of Wyndham Rewards to the Plaintiffs by touting the mass marketing campaigns Wyndham was carrying on to members of the general public. Wyndham encouraged the Plaintiffs to continue to pay for each "member's" 5% per night fee, and to enroll new members, by representing to the Plaintiffs the millions of members that were allegedly affirmatively, voluntarily enrolling to be new members and purportedly actively, affirmatively taking part in the Rewards program. Wyndham misled the Plaintiffs and potential guests / potential Rewards members to believe that those who went to Wyndham's Reservation site

voluntarily enrolled to become members of the program, as opposed to being deceptively, passively enrolled. Wyndham represented and advertised to the Plaintiffs and to franchise owners that there was a direct relationship between the amount of fees Wyndham needed to charge to administer the program and the number of guests Wyndham enrolled – Wyndham even promised to reduce the 5% fee if a certain milestone number of Rewards members was reached.[1] Wyndham misrepresented to Plaintiffs and other franchisees that the Wyndham Rewards program was amassing _millions_ of actively engaged, voluntarily enrolled new members per month thereby inducing the Plaintiffs to be willing to pay or continue to pay the 5% fee, and inducing the Plaintiffs to be willing to advertise and market these same characteristics to guests. Wyndham's statements were deceitful and fraudulent because untold but vast numbers of these so-called members had no idea they were members and had not actively, affirmatively chosen to be part of the program and as a result, this same fraud and deceit was passed on from Wyndham, through the Plaintiffs and other franchisees, to the market at large.

Wyndham's misrepresentations and uniform omissions to the franchisees directly overlapped with its misrepresentations and uniform omissions to potential guests and potential Rewards' members. Wyndham without question advertised and offered the Wyndham Rewards Program to the mass public. Due to the overlap in the subject matter and the nature of the misrepresentations, Wyndham can well be said to have offered its "service" of administering and operating the Wyndham Rewards Program to the public at large. Moreover, evidence will show that Wyndham consistently used misrepresentations and material omissions as part of its commercial policy to get the Plaintiffs to sign up new Rewards members. Wyndham attempted

---

[1] That number has, on information and belief, long since been achieved yet there has of course been no refund of fees or reduction in the fee amount.

to enlist the Plaintiffs to ensnare guests and potential Rewards members into its web of lies – all in furtherance of Wyndham's objective make more money.

Even under the red-herring analysis of the Defendants, Plaintiffs are still permitted to assert claims as "consumers" for Defendant's misrepresentations. As discussed above, there is ample potential for Plaintiffs' to demonstrate that Defendants made uniform omissions and misrepresentations about the nature, value, and operation of Wyndham Rewards. However, each and every one of the franchise agreements contains language that expressly exempts any and all non-New Jersey residents from bringing claims under New Jersey's Franchise Practices Act. *See e.g.*, Ex. A at ¶ 17.6.1. Thus, unless the NJCFA is found applicable, Wyndham will have been permitted to deliberately author the exact type of scenario the Courts in *Kavky* and *Krugler* sought to avoid – an intentional and large scale mass fraud victimizing individuals who have no other redress.

### C. The Economic Loss Doctrine Does Not Preclude the Plaintiffs' Claims Here Because Plaintiffs Allege and Seek Redress for Misconduct that Far Exceeds a Simple Breach of Contract.

Defendant claims that Plaintiffs' claims under the NJCFA must be dismissed because they "arise from the performance of a contract," are identical to Plaintiffs' breach of contract claims, and therefore are barred by New Jersey's economic loss doctrine. Defendants' assertions are patently false and a misstatement of New Jersey Law.

A simple breach of warranty or breach of contract is not *per se* unconscionable and does not violate the NJCFA. *See Gennari*, 288 N.J. Super. at 533. However, affirmative actions under the NJCFA that constitute unconscionable commercial practices which entail a lack of "good faith, honesty in fact and observance of fair dealing" are subject to the proscriptions of the NJCFA. *See, e.g.*, *Kugler v. Romain*, 58 N.J. 522, 544, 279 A.2d 640 (1971). Treble damages,

attorney's fees, and costs are awarded when there are "substantial aggravating circumstances present in addition to the breach." *See Cox*, 138 N.J. at 18, 647 A.2d 454.

Plaintiffs have brought claims for simple breach of contract and indeed, Defendants have breached their franchise agreements in a myriad of ways as set forth in the SAC and discussed further below. For example, Wyndham breached its contracts with certain Plaintiffs by imposing fees for a loyalty reward program that were never agreed upon nor permitted according to the terms of the agreement. *See* Order on Motion to Dismiss [D.E. 64] Defendants have also breached the express terms of the franchise agreements through its use of Pro-Active Matching by using the procedure to charge franchisees for "member stand-ins" who are not members but share the same last name or address as members whereas certain franchise agreements permit Wyndham only to Pro-Actively match (and charge for) "members." *See e.g.*, Ex. A at 31, Schedule C ("We will proactively match and award members with points . . . You will be billed monthly . . . for qualifying stays by program members.") Wyndham's Pro-Active matching, charging, and billing of "member stand-ins" is a breach of the express provisions of the agreement.

However, Wyndham has done much more, and Plaintiffs have alleged Wyndham's unconscionable misconduct as the bases of the "substantial aggravating factors" which take certain aspects of Wyndham's conduct and elevate it (or lower it) to conduct proscribed and subject to the NJCFA. For example, each of Wyndham's repeated and multiple misrepresentations that Wyndham Rewards members had "enrolled" in the program (as opposed to "had been enrolled" or "were enrolled" or "were automatically enrolled") is a misrepresentation the factual basis of which is outside the contract. *See, e.g., Florian Greenhouse v. Cardinal IG Corp.*, 11 F.Supp.2d 521, 528 (D.N.J.1998) (permitting fraud claim,

and noting that "the factual basis for the alleged fraud is extraneous to the contract," and that it "more closely resembles a fraud-in-the-inducement claim").

Indeed, courts applying New Jersey law have recognized that the "critical issue" with regard to the economic loss doctrine "is whether the allegedly tortious conduct is extraneous to the contract." *Emerson Radio Corp. v. Orion Sales, Inc.*, No. Civ. A. 95-6455, 2000 WL 49361, at *7 (D.N.J. 2000), *aff'd in part, rev'd in part on other grounds*, 253 F.3d 159 (3d Cir.2001). The court in Emerson Radio explained that "an act that is in breach of a specific contractual undertaking would not be extrinsic, but an act that breaches some other duty would be." *Id*. The court further illustrated "with the example of fraud, to break a promise is to breach a contractual duty; to falsely state that one intends to honor a promise is a misstatement of present fact and breaches a separate and extraneous duty not to commit fraud." *Id*.

An extensive panoply of Wyndham's misconduct is not specifically covered by any of the franchise agreements: for example, the franchise agreements contain no specific language addressing the definition of the term "member" as in "member" of Wyndham Rewards. The agreements do not specifically address Automatic Enrollment. Wyndham's misconduct and misrepresentations in relation to these issues is thus, extraneous to the Agreements and not barred by the economic loss doctrine. Similarly, the panoply of misleading and deceitful misrepresentations and uniform omissions that Wyndham made about the size of the program, its relative success, or its growth, are not covered by specific contractual provisions and thus, not barred by the economic loss doctrine.

Far beyond "mere failure to abide by alleged contractual allegations," *Def.'s Motion to Dismiss* at 13, Plaintiffs allege and will demonstrate that Defendants created, implemented, and

carried forth an entire scheme to fleece franchisees. Defendants knowingly avoided making certain statements, refused to give information, and even admitted their wrong-doing. Plaintiffs allege far more than just non-performance.

To the extent Defendants would have this Court believe that any allegations which "arise" from or relate to the Defendant's performance or non-performance of the parties' agreement are barred by the economic loss doctrine, Defendants' assertions are overly broad. It is entirely permissible, whereas here, Defendants' misconduct arises from, and originates from some contractual undertaking of the parties, but also extends far beyond conduct that is contemplated or addressed in the agreement. For example, Defendants' creation and implementation of automatic enrollment 'arose from' Wyndham's carrying forth of its obligations under the Agreement, that is, its provision of services related to Wyndham Rewards. However, automatic enrollment was never envisioned, it was never discussed in the Agreements and was largely kept secret by Defendants. It is deceitful and misleading and unconscionable subsequent performance but it constitutes substantial aggravating conduct when combined with Pro-Active matching in the manner that Wyndham. As a result, it constitutes separate tortious conduct.

Similarly, each of the misstatements and uniform omissions made by Wyndham, to the Plaintiffs or more broadly in newspapers like USA Today, constitutes a separate tort as it is conduct separate and apart from that required or contemplated by the Agreements. *See, e.g.*, *Onyx Acceptance Corp. v. Trump Hotel & Casino Resorts, Inc.*, 2008 WL 649024, *14 (N.J.Super.A.D., 2008) (affirmative misrepresentations occurred throughout October and November 2001, and on December 1, 2001, whereas the breach of contract occurred solely on

December 1, 2001 and thus, the affirmative misrepresentations which form the basis of the CFA claim are separate and distinct from the alleged breach of contract.)

To adopt Wyndham's argument at face value that any allegation of deceitful, fraudulent, or unconscionable "subsequent performance" is automatically precluded by the economic loss doctrine would have the effect of reading out of existence the language in the NJCFA which specifically targets deceitful, fraudulent, or unconscionable "subsequent performance." It is a basic canon of construction that statutes should be interpreted in a manner that avoids unreasonable or absurd results. *Strasenburgh v. Straubmuller*, 146 N.J. 527, 541, 683 A.2d 818 (1996) ("It is a venerable principle that a law will not be interpreted to produce absurd results."). Wyndham's interpretation would render the phrase "subsequent performance" superfluous and meaningless as it would be swallowed by the economic loss rule. There could be no violation of the NJCFA that originated from a contractual relationship between two parties and encompassed, at least in part, a parties' performance under a contract – no matter how egregious the offending parties' conduct was. This is obviously not the case.

### D. ORLANDO LODGING WHICH HAD ITS PRIMARY PLACE OF BUSINESS IN THE STATE OF FLORIDA HAS SUFFICIENT CONTACTS WITH THE STATE TO PURSUE CLAIMS UNDER FDUTPA.

In its ruling on Defendant's Motion to Dismiss Plaintiffs' original complaint, the Court noted that "the only plaintiff in this matter that is either a Florida corporation or that has its primary place of business in Florida" was Amar Shakti Enterprises, LLC. See Order on MTD at 5-6. However, although Orlando Lodging Associates is an Indiana LLC, Orlando Lodging's principal place of business, as its name indicates, and commercial domicile has always been in the state of Florida.

Defendants rightfully acknowledge that the applicability of FDUTPA turns upon whether or not Orlando Lodging has sufficient minimum contacts with the state of Florida to support application of FDUTPA. Orlando Lodging, having its primary place of business in Florida, clearly has sufficient contacts with the state to support a claim under FDUTPA, based on the same logic as applied by the Court to Amar Shakti Enterprises, LLC, in its prior Order. As the Third District Court of Appeals has previously noted that, "[c]onspicuously absent from this chapter… is any language which purports to confine the provisions of FDUTPA … to commercial transactions involving only Florida residents. In the absence of any such limiting language, we decline to construe chapter 501 as limiting the Department's enforcement authority to commercial transactions involving only Florida. Millennium Communications & Fulfillment, Inc. v. Office of Attorney Gen., Dept. of Legal Affairs, State of Fla., 761 So. 2d 1256, 1261 (Fla. Dist. Ct. App. 2000). *See also Messmer v. Teacher's Ins. Co.*, 588 So.2d 610, 612 (Fla. 5th DCA 1991) (plain meaning of word should apply in the absence of language altering or limiting the plain meaning); Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) ("courts of this state are without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms ...").

The Florida legislature enacted FDUTPA in 1973 to protect consumers against commercial wrongdoing and it is patterned after the Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 45 et seq. *See David J. Federbush*, THE UNEXPLORED TERRITORY OF UNFAIRNESS IN FLORIDA'S DECEPTIVE AND UNFAIRNESS IN FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, 73 Fla. B.J. 26 (May 1999) ("Federbush"). In fact, FDUTPA specifically provides that in construing its provisions, due considerations and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the FTC

Act. See § 501.204(2), Fla. Stat. (1997); *Rollins, Inc. v. Heller*, 454 So.2d 580, 584 (Fla. 3d DCA 1984). None of the express policies of the FDUTPA are advanced by limiting the cause of action to be inapplicable to out-of-state plaintiffs who incurred injury within the state's borders.

### E.    SUBCLASSES III AND IV BOTH ALLEGE VIABLE BREACH OF CONTRACT CLAIMS AGAINST THE DEFENDANTS.

Plaintiffs in Subclass III are comprised of franchisees whose franchise agreements do not expressly authorize Pro-Active Matching or Automatic Enrollment. The Plaintiffs in Subclass IV are comprised of franchisees whose franchise agreements do not expressly authorize or permit Automatic Enrollment. Plaintiffs have stated viable breach of contract claims on behalf of both subclasses.

First, with respect to both subclasses, Plaintiffs have alleged that Defendants artificially inflated the rolls of the Wyndham Rewards membership program thereby improperly inflating and overcharging Plaintiffs in breach of the express terms of the agreements. Subclass III members' agreements contain contractual provisions which state (or are substantially similar):

> We will charge you a Mandatory Marketing Program Charge for your participation our frequent guest rewards program . . . Under this program, program members staying at qualifying rates . . . will earn points . . . The Mandatory Marketing Program Charge will be 5% of the Gross Room Sales accruing from each qualifying stay . . . You will be billed monthly in arrears for qualifying stays by program members during the preceding month. *See e.g.*, Ex. B at 33, Schedule C

Subclass IV members' agreements contain contractual provisions which state (or are substantially similar):

> We charge you a Mandatory Marketing Program Charge for your participation in the TripRewards or successor guest loyalty program. . . Under TripRewards, program members staying at qualifying rates . . . earn . . . points . . . The Mandatory Marketing Program Charge is up to 5% of the Gross Room Revenues accruing from each qualifying stay . . . We will proactively match and award

> members with points . . . <u>You will be billed monthly in arrears for qualifying stays by program members during the preceding month.</u>  *See*, Ex. A at 31, Schedule C.

Evidence adduced through discovery and at trial will demonstrate that, in direct contravention of the underlined language, in each of the agreements, Defendants Pro-Actively matched, awarded points to, billed and collected fees from Defendants, for non-members.  More specifically, based upon the nature of how Pro-Active Matching is implemented, Defendants actually match up individuals who are not members with those who are members based upon an identity of name, address, zip code or other information.  These "member stand-ins" cannot conceivably be claimed to be members and Defendants regular award of points and imposition of fees breaches the language of the Agreements.

Defendants have further breached the express terms of both sub-classes III and IV's agreements by "retaining, using, and carrying over" the franchise fees collected whereas the franchise agreements specifically states that Defendants' marketing fees are to be used "for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services."  *See* Ex. A at ¶ 4.3.1.  *See also* Ex. B at ¶¶ 4.2 ("We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System . . . We may use fund in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System"); 4.3.1 ("System Assessment Fees may reimburse us or an affiliate for the reasonable and indirect costs, overhead or other expenses of providing marketing services").

In addition, as set forth throughout Count II, Defendants have breached the implied covenant of good faith and fair dealing that is an intrinsic and implicit provision in every contract. In New Jersey, the covenant of good faith and fair dealing is contained in all contracts and mandates that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575 (1997); *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965).

As New Jersey courts have recognized, "[a]rrangements embodied in a contract may be such that the parties have impliedly agreed to certain terms and conditions which have not been expressly stated in the written document." *Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 425 A.2d 1057 (1981). Moreover, "[t]here are also some situations in which a condition will be implied 'on grounds of fairness and justice.'" *Id.* Here, it was understood and implied that term "member" of a loyalty reward program would be defined according to ordinary and customary usage. It was implied and understood that if the franchisee was to be billed for qualifying stays by "members" of a guest loyalty program, that Wyndham would not, exercise its discretion to redefine who could be a member so as to a) frustrate the underlying purpose of the agreement, and b) encompass wholesale <u>millions</u> of people who had not chosen to become members or did not even know they were members.

Defendants breached the implied covenant of good faith and fair dealing for subclasses III and IV by redefining the meaning of the term "member" to include people who were automatically enrolled, and by joining Pro-Active Matching with Automatic Enrollment. Wyndham's actions with respect to its redefinition of the term "member" to include those automatically enrolled, e.g., people who were unaware they were even in the program, and its

combination with Pro-Active Matching, e.g., people being awarded points and Plaintiffs being billed without the so-called "member" ever asking to be afforded points, is no different than Wyndham having used its discretion to issue a redefinition that from hence forth, 'Every individual who has stayed at a Wyndham brand hotel and paid by either cash or credit card is now a member of Wyndham Rewards for whom Plaintiffs will be charged each time they stay at a property." It represents an abuse of discretion, a clear frustration of Plaintiffs' objectives under the franchise agreement generally, and under any provisions addressing a loyalty rewards program, and, in light of Defendants consistent failure to disclose key aspects of their scheme (such as automatic enrollment) evinces "bad faith" and commercially unreasonable behavior. *See Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445 (1993). The SAC is replete with further evidence and instances of bad faith such as Wyndham's policy of refusing or ignoring requests for information and its more recent efforts to 'strong arm' and retaliate against certain Plaintiffs for their involvement in the lawsuit. Evidence will show that Defendants uniformly omitted any explanation or discussion of how Pro-Active Matching functioned, in combination with Automatic Enrollment for years. *See Brunswick Hills Racquet Club, Inc., v.Route 18 Shopping Center Associates*, 182 N.J. 210, 864 A.2d 387 (2004) ("As a general rule, subterfuges and evasions in the performance of a contract violate the covenant of good faith and fair dealing, even though the actor believes his conduct to be justified.") Defendants misconduct, as clearly alleged in the SAC forms a valid basis for Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing.

Contrary to Defendants' arguments, the express of terms of the franchise agreement do not address Automatic Enrollment and thus, there can be no assertion that the implied duty is being used to override "clear terms." As indicated in the SAC, the limitation upon the use and

imposition of Pro-Active Matching was (in addition to it being applied to people who were enrolled in <u>some</u> way, unlike "member stand-ins") that not be combined with some further scheme and artifice to exponentially inflate the rolls and charges with people who had not actually enrolled.

**F. Plaintiffs Have Not Alleged Duplicative Claims in Asserting a Breach of the Covenant of Good Faith and Fair Dealing as Part of Count I.**

Plaintiffs claims for breach of the implied covenant of good faith and fair dealing in Count I are based upon the fact that Subclasses I and II were also victimized by the Defendants' use of Pro-Active Matching and Automatic Enrollment to create a phantom membership class in violation of the implied terms of the franchise agreements. It is permissible and not a duplicative cause of action to allege a breach of the implied covenant of good faith and fair dealing under New Jersey law for a breach of terms that are implied in the contract, as opposed to a breach of terms that are express. *See Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 257, 791 A.2d 1068 (App.Div.2002); *Kurnik v. Cooper Health System*, 2008 WL 2829963, (N.J.Super.A.D., July 24, 2008).

Respectfully Submitted,
By: /s/ Wesley J. Farrell, Esq.
FLBN 71785
Farrell & Patel,
The Four Seasons Tower
1425 Brickell Ave., Suite 58C
Miami, FL 33131
Office: 305-798-4177
Fax: 1-800-946-6711

Farmer Jaffe Weissing Edwards Fistos
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 14, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Wesley J. Farrell, Esq.